**Betty MANASCO, as Workers' Compensation Beneficiary of the Estate of Jack Manasco, Deceased, Appellant,**

v.

**INSURANCE COMPANY OF The STATE OF PENNSYLVANIA, Appellee.**

No. 06–02–00011–CV.

Court of Appeals of Texas, Texarkana.

Submitted Aug. 6, 2002.

Decided Oct. 10, 2002.

Michael E. Starr, Hommel & Starr, PC, Preston W. McGee, Tyler, for appellant.

D. Jeffrey Rambin, Law Offices of G. Thomas Allison, III, PC, G. Thomas Allison III, Merriman, Patterson & Allison, Longview, for appellee.

Before MORRISS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Chief Justice MORRISS.

Betty Manasco, in her capacity as workers' compensation beneficiary of the estate of Jack Manasco, appeals the summary judgment entered in favor of the Insurance Company of the State of Pennsylvania. Manasco had filed this action in the trial court to appeal a decision of an appeals panel of the Texas Workers' Compensation Commission.

In the proceedings below, the parties stipulated that, on May 20, 1996, Jack Manasco sustained a compensable injury, i.e., a head injury, in the course and scope of his employment as a truck driver; that, about a year later, he was diagnosed with a malignant brain tumor; and that, about six months later, he died from the tumor. The workers' compensation hearing officer found that the evidence failed to show Jack Manasco's head injury was a producing cause of his brain tumor. The appeals panel affirmed that decision.

In the trial court, the insurance company moved to exclude the testimony of Manasco's expert witness, Dr. Richard Ham-

er, a board-certified neurologist who treated Jack Manasco. In his depositions and at a pretrial hearing, Dr. Hamer testified Jack Manasco's head injury caused his brain tumor. The trial court granted the insurance company's motion. The insurance company then filed a no-evidence motion for summary judgment, which the trial court granted. On appeal, Manasco contends the trial court erred in excluding Dr. Hamer's testimony and, therefore, in granting summary judgment.

■ The decision to admit evidence rests within the sound discretion of the trial court. *Austin v. Kerr–McGee Refining Corp.*, 25 S.W.3d 280, 287 (Tex.App.-Texarkana 2000, no pet.). We review the trial court's decision to exclude evidence under an abuse of discretion standard. *Id.* To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to guiding rules or principles; in other words, we determine whether the act was arbitrary or unreasonable. *Id.* We will not conclude the trial court abused its discretion merely because, in the same circumstances, we would have ruled differently. *Id.* The trial court, however, has no discretion to apply the law erroneously. *Id.*

■ Texas Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Tex.R. Evid. 702. Rule 702 requires the proponent of expert testimony to show that the expert is qualified, that the expert's testimony is relevant to the issues in the case, and that the expert's testimony is reliable. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995); *Austin*, 25 S.W.3d at 284. The trial court must make a threshold determination of the admissibility of expert testimony under Rule 702. *Robinson*, 923 S.W.2d at 556.

■ To be reliable, the scientific techniques or principles underlying the expert's testimony must be well grounded in the methods and procedures of science. *Id.* at 557; *Austin*, 25 S.W.3d at 284. In determining the reliability of an expert's testimony, a trial court may consider the following nonexhaustive list of factors: (1) the extent to which the theory has been or can be tested; (2) the extent to which the techniques rely on the subjective interpretation of the expert; (3) whether the theories have been subjected to peer review and/or publication; (4) the techniques' potential rate of error; (5) whether the underlying theories or techniques have been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses which have been made of the theories or techniques. *Robinson*, 923 S.W.2d at 557; *Austin*, 25 S.W.3d at 284.

In analyzing whether Jack Manasco's head injury was the cause of his malignant brain tumor, the parties apply the analysis set out in *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714–15 (Tex. 1997). Specifically, the parties agree that to establish causation Manasco had to provide evidence of both general causation and specific causation.[1] *See id.* General

---

1. While *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706 (Tex.1997), was a toxic tort case, the parallels to the present case are undeniable. In both cases, the plaintiffs had

to prove an injury was caused by a unique event (in *Havner*, the use of Bendectin; here, a head injury). In both cases, there was a lack of data from controlled scientific experi-

causation inquires whether a head injury can cause a brain tumor; specific causation inquires whether within a reasonable medical probability Manasco's head injury caused his brain tumor. *See id.*

In *Havner*, the Texas Supreme Court held that, in the absence of direct, scientifically reliable proof of causation, a party may show causation with epidemiological studies, i.e., studies that examine existing populations to determine whether an association exists between a disease or condition and a factor suspected of causing that disease or condition. *Id.* at 715. The Texas Supreme Court suggested that, to be reliable, epidemiological evidence should have a relative risk of 2.0, meaning that the risk of an injury or condition in the exposed population should be more than double the risk in the unexposed or control population, but that such a relative risk is not a litmus test. *Id.* at 717–18.

■ In evaluating the admissibility of Dr. Hamer's testimony, the trial court considered several articles exploring the purported link between head injuries and brain tumors. In an article titled *Intracranial Tumours* published in 1888, Dr. B. Bramwell, a neurologist, wrote:

> Amongst the more direct causes [of tumor formation], injury occupies an important place. There can, I think, be little doubt that blows and falls on the head do sometimes lead to the formation of gliomatous, and perhaps also of sarcomatous tumours; syphilitic tumours, too, not infrequently appear to owe their exciting cause to a head injury; and in two instances I have known a scrofulous tumour to follow a severe blow upon the head, the new growth developing either immediately below the seat of the injury, or at the point of contre-coup. The

explanation of such cases is probably this, that the blow produces a local inflammatory lesion or contusion, which forms a suitable nidus for the development of the tubercular germs (tubercle bacillus or its spores) which are already circulating through the system.

In *Brain Tumors: Their Biology and Pathology*, a textbook published in 1957, Dr. K.J. Zülch, a professor of Neurology at the University of Cologne, wrote:

> A further possibility to learn more about the origin of brain tumors lies in the study of the relationship between accidents and brain tumors. This involves the problem of the traumatic origin of tumors which might be conceived of as being due to the splitting-off (during trauma) of a tissue fragment that subsequently undergoes faulty regeneration and becomes the "germ" of a future tumor.
>
> . . . .
>
> The possibility of the traumatic origin of brain tumors has been considered ever since the time of classical neurology and pathology [citing Bramwell and others]. The figures quoted vary between two and nine per cent [sic] of cases. Parker and Kernohan wrote one of the best critical reviews of the significance of head injury in the development of brain tumors. In a large series of tumor cases they found 13.4% with a head injury but after critical evaluation found that in only 4.8% could a connection between the trauma and the tumor be seriously considered. For comparison, however, they produced a group of 431 patients of corresponding age with other diseases, of whom 10.4% had a history of head trauma. Finally, in a correspond-

ments, causing the expert witnesses to rely on epidemiological evidence. Therefore, we will

apply the same analysis.

ing group of healthy individuals of the same age and occupation, 71 (i.e., 35.5%) had a similar history of head trauma.

. . . .

Taking into consideration this previous work as well as our own knowledge of the biology of brain tumors, the following prerequisites should be demanded.

1. *The patient should have been well before the accident* . . . .

2. *The head trauma must have been adequate,* i.e., sufficient to produce a destruction of parts of the brain or its coverings leading to chronic regenerative processes.. . . .

3. *The site of tumor formation must correspond to that receiving the trauma.* . . .

4. *The time interval between the trauma and the development of the tumor should be adequate.* . . .

5. *The tumor has to be proved histologically at autopsy or by biopsy.* . . .

6. *The external force should be defined as sufficient to be considered true trauma.* . . .

In an article titled *Glioma in Trauma,* which was published in 1972 in a textbook titled *Pathology of the Nervous System,* Elias Manuelidis outlined similar criteria: (1) authenticity and adequacy of the trauma; (2) previous integrity of the wounded part; (3) origin of the tumor at the exact point of injury; (4) a reasonable time interval between injury and the appearance of the tumor; (5) the presence and nature of the tumor; (6) the trauma should be histologically proved; (7) bleeding, edema, and scars (recent and old) secondary to the existence of the tumor, should be clearly distinguished from the traumatic injury; and (8) the tumor should be in direct continuity with the traumatic scar, not merely in its vicinity or separated by a narrow zone of healthy or slightly altered tissue.

Manuelidis then discussed numerous case studies and concluded:

In summary it should be stated that a small number of gliomas were found at the exact site of trauma and in direct continuity with brain scars. These cases fulfilled the stringent criteria set forth for the evaluation of the subject tumor trauma. The importance of these reports in medico-legal matters is obvious. Their significance for the pathogenesis of gliomas is, due to the small number of cases, questionable.

In evaluating these cases one should not have preconceived notions and should not draw broad etiologic conclusions. However, these few cases do present fascinating pathologic possibilities and represent an important general problem in pathology.

In a 1978 article titled *Trauma and Brain Tumors: An Experimental Study,* published in the journal *Neurosurgery,* Dr. Robert Morantz and Dr. William Shain reported their findings from an experiment conducted on rats. The rats were injected with a known carcinogen during gestation and, after they were born, a group of those rats were "anesthetized and traumatized by insertion of a 25 gauge hypodermic needle into the left cerebrum."

The study showed sixty-two percent of the traumatized rats developed a cerebral glioma as opposed to forty-seven percent of a control group. The traumatized group also exhibited a higher incidence of glioma formation on the left side of the brain. The researchers concluded that "intracerebral trauma can act as a cocarcinogen and enhance glioma formation," but that, "although a very low statistical correlation between head trauma and brain tumor formation is possible, this relationship seems to be of no clinical significance."

In a 1998 article published in the *International Journal of Epidemiology,* Susan

Preston–Martin and others reported results from an epidemiological study of people with brain tumors. The researchers concluded, "Evidence for elevated brain tumour risk after head trauma was strongest for meningiomas in men." However, they also wrote:

The fact that epidemiological studies, including this one, have not shown a convincing causal relationship between head trauma and brain tumour development may reflect the deficiencies of studies investigating this association and the fact that the association, if one exists, is not a direct one.

. . . .

Our findings suggest that an association between head trauma and brain tumour risk cannot be ruled out and should therefore be further studied.

In an article published in 2000 in the *British Journal of Neurosurgery*, P.T. Henry and V. Rajshekhar presented a case study of a patient who met the criteria outlined by Zülch and Manuelidis. The authors also noted, "Epidemiological studies do not, however, support a definite relationship between head injury and intracranial neoplasm." They summarized the prevailing epidemiological evidence as follows:

Parker & Kernohan recorded an incidence of 4.8% of mild head injury in a series of 431 patients with brain tumour. In a control group of 431 unselected patients with other diseases and similar ages, the incidence of cranial trauma was 10.4% whereas it was 35.5% in another group of 200 normal controls. The same authors followed 2858 individuals for 14 years who sustained a head injury in World War I and none developed a brain tumour. Choi, et. al., did not find a significantly different incidence of cranial trauma in a group of 126 patients with brain tumour and a control group. Scheid recorded six brain tumours among 14,445 cases of missile injuries (incidence=0.04%). Annegers followed 2953 patients with head injuries for a total of 29,859 person-years, and did not find a difference between the actual and the expected number of brain tumours, which were 4 and 4.1%, respectively. Experimental studies where neurocarcinogens were administered to animals and then exposed to cranial trauma also produced contradictory results. However, Morantz & Shain suggest that under certain conditions cranial trauma may act as a cocarcinogen and enhance the rate of glioma formation in rats exposed to a potent carcinogen.

In *Principles of Neurology*, a foundational treatise in the field of neurology, the following excerpt is found:

Antecedent head injury, infection, metabolic and other systemic disease, and exposure to toxins and radiation have all been invoked as causative factors; however, with the exception of radiation and possibly viral infection, there is no conclusive evidence that any of them play a part in the causation of cerebral neoplasms in humans.

The literature on which Dr. Hamer relied establishes that the medical community has long hypothesized a causative relationship between head injuries and brain tumors; that doctors have established a criteria for evaluating when, if ever, it could be said a particular brain tumor was caused by a head injury; that cases have come to light which meet this criteria; that an animal study showed a head injury could enhance the formation of a tumor; and that epidemiological studies have been inconclusive in establishing a causative link between head injuries and brain tumors.

Manasco contends Dr. Hamer based his opinion concerning general causation on

the criteria established by Zülch and Manuelidis, and his opinion concerning specific causation on his examination of Jack Manasco, on Jack Manasco's patient history, and on the use of differential diagnosis, i.e., ruling out other causes. Her argument is essentially that the Zülch/Manuelidis criteria is generally accepted in the medical community, has been peer reviewed, and was developed for a purpose other than for litigation. She contends that, because Dr. Hamer testified Jack Manasco's tumor met each element of the Zülch/Manuelidis criteria, she met her burden of establishing a causative link between Jack Manasco's head injury and his brain tumor.

As we understand the medical literature presented to the trial court, however, the Zülch/Manuelidis criteria was established to allow medical researchers to rule out instances of brain tumors that were definitely not caused by a head injury. None of the articles took the step Dr. Hamer took in the trial court, i.e., using the criteria to say it establishes a causal link. The medical literature reflects that no such link has been established through epidemiological or other studies. Therefore, the trial court was well within the zone of reasonableness in excluding Dr. Hamer's testimony. We overrule the point of error.

We affirm the judgment.