In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00011-CV


______________________________




BETTY MANASCO, AS WORKERS' COMPENSATION BENEFICIARY OF 

 THE ESTATE OF JACK MANASCO, DECEASED, Appellant


V.



INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, Appellee




 


On Appeal from the 124th Judicial District Court


Gregg County, Texas


Trial Court No. 2000-767-B




 




Before Morriss, C.J., Grant and Ross, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 Betty Manasco, in her capacity as workers' compensation beneficiary of the estate of Jack
Manasco, appeals the summary judgment entered in favor of the Insurance Company of the State of
Pennsylvania. Manasco had filed this action in the trial court to appeal a decision of an appeals
panel of the Texas Workers' Compensation Commission.

 In the proceedings below, the parties stipulated that, on May 20, 1996, Jack Manasco
sustained a compensable injury, i.e., a head injury, in the course and scope of his employment as a
truck driver; that, about a year later, he was diagnosed with a malignant brain tumor; and that, about
six months later, he died from the tumor. The workers' compensation hearing officer found that the
evidence failed to show Jack Manasco's head injury was a producing cause of his brain tumor. The
appeals panel affirmed that decision.

 In the trial court, the insurance company moved to exclude the testimony of Manasco's expert
witness, Dr. Richard Hamer, a board-certified neurologist who treated Jack Manasco. In his
depositions and at a pretrial hearing, Dr. Hamer testified Jack Manasco's head injury caused his brain
tumor. The trial court granted the insurance company's motion. The insurance company then filed
a no-evidence motion for summary judgment, which the trial court granted. On appeal, Manasco
contends the trial court erred in excluding Dr. Hamer's testimony and, therefore, in granting summary
judgment.

 The decision to admit evidence rests within the sound discretion of the trial court. Austin v.
Kerr-McGee Refining Corp., 25 S.W.3d 280, 287 (Tex. App.-Texarkana 2000, no pet.). We review
the trial court's decision to exclude evidence under an abuse of discretion standard. Id. To determine
whether a trial court abused its discretion, we must decide whether the trial court acted without
reference to guiding rules or principles; in other words, we determine whether the act was arbitrary
or unreasonable. Id. We will not conclude the trial court abused its discretion merely because, in
the same circumstances, we would have ruled differently. Id. The trial court, however, has no
discretion to apply the law erroneously. Id.

 Texas Rule of Evidence 702 provides:

 If scientific, technical, or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue, a witness qualified as an
expert by knowledge, skill, experience, training, or education may testify thereto in
the form of an opinion or otherwise.


Tex. R. Evid. 702. Rule 702 requires the proponent of expert testimony to show that the expert is
qualified, that the expert's testimony is relevant to the issues in the case, and that the expert's
testimony is reliable. E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex.
1995); Austin, 25 S.W.3d at 284. The trial court must make a threshold determination of the
admissibility of expert testimony under Rule 702. Robinson, 923 S.W.2d at 556.

 To be reliable, the scientific techniques or principles underlying the expert's testimony must
be well grounded in the methods and procedures of science. Id. at 557; Austin, 25 S.W.3d at 284. 
In determining the reliability of an expert's testimony, a trial court may consider the following
nonexhaustive list of factors: (1) the extent to which the theory has been or can be tested; (2) the
 extent  to  which  the  techniques  rely  on  the  subjective  interpretation  of  the expert; (3) whether
the theories have been subjected to peer review and/or publication; (4) the techniques' potential rate
of error; (5) whether the underlying theories or techniques have been generally accepted as valid by
the relevant scientific community; and (6) the nonjudicial uses which have been made of the theories
or techniques. Robinson, 923 S.W.2d at 557; Austin, 25 S.W.3d at 284.

 In analyzing whether Jack Manasco's head injury was the cause of his malignant brain tumor,
the parties apply the analysis set out in Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 714-15 (Tex. 1997). Specifically, the parties agree that to establish causation Manasco had to provide
evidence of both general causation and specific causation. (1) See id. General causation inquires
whether a head injury can cause a brain tumor; specific causation inquires whether within a
reasonable medical probability Manasco's head injury caused his brain tumor. See id.

 In Havner, the Texas Supreme Court held that, in the absence of direct, scientifically reliable
proof of causation, a party may show causation with epidemiological studies, i.e., studies that
examine existing populations to determine whether an association exists between a disease or
condition and a factor suspected of causing that disease or condition. Id. at 715. The Texas Supreme
Court suggested that, to be reliable, epidemiological evidence should have a relative risk of 2.0,
meaning that the risk of an injury or condition in the exposed population should be more than double
the risk in the unexposed or control population, but that such a relative risk is not a litmus test. Id.
at 717-18.

 In evaluating the admissibility of Dr. Hamer's testimony, the trial court considered several
articles exploring the purported link between head injuries and brain tumors. In an article titled
Intracranial Tumours published in 1888, Dr. B. Bramwell, a neurologist, wrote:

 Amongst the more direct causes [of tumor formation], injury occupies an important
place. There can, I think, be little doubt that blows and falls on the head do
sometimes lead to the formation of gliomatous, and perhaps also of sarcomatous
tumours; syphilitic tumours, too, not infrequently appear to owe their exciting cause
to a head injury; and in two instances I have known a scrofulous tumour to follow a
severe blow upon the head, the new growth developing either immediately below the
seat of the injury, or at the point of contre-coup. The explanation of such cases is
probably this, that the blow produces a local inflammatory lesion or contusion, which
forms a suitable nidus for the development of the tubercular germs (tubercle bacillus
or its spores) which are already circulating through the system.

 In Brain Tumors: Their Biology and Pathology, a textbook published in 1957, Dr. K. J.
Zülch, a professor of Neurology at the University of Cologne, wrote:

 A further possibility to learn more about the origin of brain tumors lies in the study
of the relationship between accidents and brain tumors. This involves the problem
of the traumatic origin of tumors which might be conceived of as being due to the
splitting-off (during trauma) of a tissue fragment that subsequently undergoes faulty
regeneration and becomes the "germ" of a future tumor.


 . . . .


 The possibility of the traumatic origin of brain tumors has been considered ever since
the time of classical neurology and pathology [citing Bramwell and others]. The
figures quoted vary between two and nine per cent [sic] of cases. Parker and
Kernohan wrote one of the best critical reviews of the significance of head injury in
the development of brain tumors. In a large series of tumor cases they found 13.4%
with a head injury but after critical evaluation found that in only 4.8% could a
connection between the trauma and the tumor be seriously considered. For
comparison, however, they produced a group of 431 patients of corresponding age
with other diseases, of whom 10.4% had a history of head trauma. Finally, in a
corresponding group of healthy individuals of the same age and occupation, 71 (i.e.,
35.5%) had a similar history of head trauma.


 . . . .


 Taking into consideration this previous work as well as our own knowledge of the
biology of brain tumors, the following prerequisites should be demanded.


 1. The patient should have been well before the accident . . . .

 2. The head trauma must have been adequate, i.e., sufficient to produce
a destruction of parts of the brain or its coverings leading to chronic regenerative
processes. . . . .

 3. The site of tumor formation must correspond to that receiving the
trauma . . . .

 4. The time interval between the trauma and the development of the
tumor should be adequate . . . .

 5. The  tumor  has  to  be  proved  histologically  at  autopsy  or  by
biopsy . . . .

 6. The external force should be defined as sufficient to be considered
true trauma . . . .


 In an article titled Glioma in Trauma, which was published in 1972 in a textbook titled
Pathology of the Nervous System, Elias Manuelidis outlined similar criteria: (1) authenticity and
adequacy of the trauma; (2) previous integrity of the wounded part; (3) origin of the tumor at the
exact point of injury; (4) a reasonable time interval between injury and the appearance of the tumor;
(5)  the  presence  and  nature  of  the  tumor;  (6)  the  trauma  should  be  histologically  proved; (7)
bleeding, edema, and scars (recent and old) secondary to the existence of the tumor, should be
clearly distinguished from the traumatic injury; and (8) the tumor should be in direct continuity with
the traumatic scar, not merely in its vicinity or separated by a narrow zone of healthy or slightly
altered tissue. Manuelidis then discussed numerous case studies and concluded:

 In summary it should be stated that a small number of gliomas were found at
the exact site of trauma and in direct continuity with brain scars. These cases
fulfilled the stringent criteria set forth for the evaluation of the subject tumor trauma. 
The importance of these reports in medico-legal matters is obvious. Their
significance for the pathogenesis of gliomas is, due to the small number of cases,
questionable.


 In evaluating these cases one should not have preconceived notions and
should not draw broad etiologic conclusions. However, these few cases do present
fascinating pathologic possibilities and represent an important general problem in
pathology.


 In a 1978 article titled Trauma and Brain Tumors: An Experimental Study, published in the
journal Neurosurgery, Dr. Robert Morantz and Dr. William Shain reported their findings from an
experiment conducted on rats. The rats were injected with a known carcinogen during gestation and,
after they were born, a group of those rats were "anesthetized and traumatized by insertion of a
25 gauge hypodermic needle into the left cerebrum." 

 The study showed sixty-two percent of the traumatized rats developed a cerebral glioma as
opposed to forty-seven percent of a control group. The traumatized group also exhibited a higher
incidence of glioma formation on the left side of the brain. The researchers concluded that
"intracerebral trauma can act as a cocarcinogen and enhance glioma formation," but that, "although
a very low statistical correlation between head trauma and brain tumor formation is possible, this
relationship seems to be of no clinical significance." 

 In a 1998 article published in the International Journal of Epidemiology, Susan Preston-Martin and others reported results from an epidemiological study of people with brain tumors. The
researchers concluded, "Evidence for elevated brain tumour risk after head trauma was strongest for
meningiomas in men." However, they also wrote:

 The fact that epidemiological studies, including this one, have not shown a
convincing causal relationship between head trauma and brain tumour development
may reflect the deficiencies of studies investigating this association and the fact that
the association, if one exists, is not a direct one.


 . . . .


 Our findings suggest that an association between head trauma and brain
tumour risk cannot be ruled out and should therefore be further studied.


 In  an  article  published  in  2000  in  the  British  Journal  of  Neurosurgery,  P.  T.  Henry
and V. Rajshekhar presented a case study of a patient who met the criteria outlined by Zülch and
Manuelidis. The authors also noted, "Epidemiological studies do not, however, support a definite
relationship between head injury and intracranial neoplasm." They summarized the prevailing
epidemiological evidence as follows:

 Parker & Kernohan recorded an incidence of 4.8% of mild head injury in a series of
431 patients with brain tumour. In a control group of 431 unselected patients with
other diseases and similar ages, the incidence of cranial trauma was 10.4% whereas
it was 35.5% in another group of 200 normal controls. The same authors followed
2858 individuals for 14 years who sustained a head injury in World War I and none
developed a brain tumour. Choi, et. al., did not find a significantly different
incidence of cranial trauma in a group of 126 patients with brain tumour and a
control group. Scheid recorded six brain tumours among 14,445 cases of missile
injuries (incidence=0.04%). Annegers followed 2953 patients with head injuries for
a total of 29,859 person-years, and did not find a difference between the actual and
the expected number of brain tumours, which were 4 and 4.1%, respectively. 
Experimental studies where neurocarcinogens were administered to animals and then
exposed to cranial trauma also produced contradictory results. However, Morantz
& Shain suggest that under certain conditions cranial trauma may act as a
cocarcinogen and enhance the rate of glioma formation in rats exposed to a potent
carcinogen.


 In Principles of Neurology, a foundational treatise in the field of neurology, the following
excerpt is found:

 Antecedent head injury, infection, metabolic and other systemic disease, and
exposure to toxins and radiation have all been invoked as causative factors; however,
with the exception of radiation and possibly viral infection, there is no conclusive
evidence that any of them play a part in the causation of cerebral neoplasms in
humans.


 The literature on which Dr. Hamer relied establishes that the medical community has long
hypothesized a causative relationship between head injuries and brain tumors; that doctors have
established a criteria for evaluating when, if ever, it could be said a particular brain tumor was
caused by a head injury; that cases have come to light which meet this criteria; that an animal study
showed a head injury could enhance the formation of a tumor; and that epidemiological studies have
been inconclusive in establishing a causative link between head injuries and brain tumors.

 Manasco contends Dr. Hamer based his opinion concerning general causation on the criteria
established by Zülch and Manuelidis, and his opinion concerning specific causation on his
examination of Jack Manasco, on Jack Manasco's patient history, and on the use of differential
diagnosis, i.e., ruling out other causes. Her argument is essentially that the Zülch/Manuelidis criteria
is generally accepted in the medical community, has been peer reviewed, and was developed for a
purpose other than for litigation. She contends that, because Dr. Hamer testified Jack Manasco's
tumor met each element of the Zülch/Manuelidis criteria, she met her burden of establishing a
causative link between Jack Manasco's head injury and his brain tumor.

 As we understand the medical literature presented to the trial court, however, the
Zülch/Manuelidis criteria was established to allow medical researchers to rule out instances of brain
tumors that were definitely not caused by a head injury. None of the articles took the step Dr. Hamer
took in the trial court, i.e., using the criteria to say it establishes a causal link. The medical literature
reflects that no such link has been established through epidemiological or other studies. Therefore,
the trial court was well within the zone of reasonableness in excluding Dr. Hamer's testimony. We
overrule the point of error.

 We affirm the judgment.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: August 6, 2002

Date Submitted: October 10, 2002


Publish
1. While Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706 (Tex. 1997), was a toxic tort
case, the parallels to the present case are undeniable. In both cases, the plaintiffs had to prove an
injury was caused by a unique event (in Havner, the use of Bendectin; here, a head injury). In both
cases, there was a lack of data from controlled scientific experiments, causing the expert witnesses
to rely on epidemiological evidence. Therefore, we will apply the same analysis.